This action was brought by the plaintiffs for the purpose of having the defendants enjoined from proceeding under Public-Local Laws 1915, ch. 512, to build a fence around the county of Duplin and from contracting *Page 474 
any debt or levying taxes to pay for the same or the maintenance thereof, and generally from attempting to execute or carry out the provisions of said statute. Judge Connor granted a restraining order, which was dissolved by him, after hearing the report of referees appointed to ascertain and report the facts in regard to the result of the election held under the statute, and after having first approved the finding of the referees that a majority of the qualified voters of the county had voted against "stock law." A part of the territory of the county was already subject to "stock law" under the provisions of previous enactments, and under the act of 1915 they remained so, notwithstanding the adverse (413) vote at the election. It was provided by the act of 1915 that an election should be held on Tuesday after the first Monday of October, 1915, upon the question of "stock law" or "no stock law," and that if a majority of the votes were in favor of "stock law" it should be unlawful for stock to run at large, and the county should be subject to certain provisions of Revisal, 1905, ch. 35, and sections 1681, 3319, 3320, 3321, applicable to stock-law territory. It is further provided that "in the event a majority of the votes cast be in favor of stock law it shall not be necessary to erect a fence around the county, district, or territory that had a stock law prior to 1 March, 1914," and if the majority of the votes be against stock law, it shall be lawful for stock to run at large in the county as therein provided, except in that part of the county already under the operation of stock laws, and in that case the county commissioners are required to build a fence around the county, or any part thereof, or around such parts of the same as will protect the citizens of the county, and also such fences around territory already under stock law as are necessary to protect the inhabitants of that section of the county from the stock of other counties. The statute then authorizes the commissioners to borrow money and to levy the necessary taxes from time to time for the purposes of defraying the expense of building the county fence and of maintaining the same in good condition, the tax not to exceed 15 cents on $100 of the assessed value of property and 45 cents on the poll until the indebtedness is fully paid. It is further provided, in section 4 of said statute as follows: "Such part of the said fence as does not constitute a boundary of stock-law territory in Duplin County shall be and remain a county charge, to be kept up and maintained by the county of Duplin, and the board of commissioners of Duplin County may annually levy a special tax, not exceeding 15 cents on the $100 valuation on property in said county and not exceeding 45 cents on the poll, to keep up and repair said county fence; but the expense of keeping up and repairing the fence in the special stock-law territories in said county shall be borne by the levy of a tax annually of not more than 15 cents on the $100 valuation on the real and personal property *Page 475 
and 45 cents on the poll in each of said respective districts, the amount to be levied to be as requested by the fence commissioners in the respective territories." Section 5 provides: "In case the vote of the citizens of Duplin County cast at said election shall be a majority vote against the stock law, none of the provisions of this act shall be effective until the fence or fences shall be erected as provided by section 3 of this act."
The plaintiffs appealed from the order of Judge Connor by which he vacated the restraining order formerly issued by him.
After stating the case: 1. The first position taken by the (414) plaintiffs is that the election held under the act of 1915 is of no effect, as a majority of the qualified voters did not cast their votes "against stock law" in the county. They contend that this is true, because the report of the canvassing board shows that there were 3,851 voters in the county and that only 1,774 votes were cast against a stock law, while 802 votes were cast in favor of it. But the registration books were revised and purged of all voters who had died or lost the right to vote, and the true number of qualified voters ascertained to be 3,343 and the 1,730 votes cast against stock law constitute a clear majority of this number, the difference being 58 votes. This result was ascertained by three impartial referees, who were selected by the court and the parties, one by each of them. Their report was approved and confirmed by the judge, and though we may have the jurisdiction to review the finding, we have no disposition to do so, under the circumstances, and if we should do so we would reach the same conclusion, as there is no evidence before us that necessarily conflicts with or that cannot be easily reconciled with it. It, therefore, must be that the contention of the plaintiffs, "that a majority of the qualified voters of Duplin County did not participate in said election and vote `against stock law,' and thereby authorize the commissioners of Duplin County to contract the debt attempted to be authorized by said act, and levy the taxes therein provided for, with which to repay said debt, as required by Article VII, sec. 8, of the Constitution of North Carolina," cannot be sustained.
The plaintiffs attack the validity of the legislation upon two principal grounds:
1. That the act is void because the taxes thereby authorized are not uniform; the property and polls in one section of the county being taxed at a greater rate than the property and polls in other sections of the county. *Page 476 
2. Under the assessment plan the act is void, because the property situate within the special stock-law territories cannot in any manner be benefited by the assessment.
At the present term we have held, in Keith v. Lockhart, post, 451, that the building of a fence around a county under the circumstances as they appear in this case is not a necessary expense, and a vote of the people is required to raise the means of taxation for paying the cost of it, but that a vote by the people of the county in favor of free range, or, as it is termed in the statute, "no stock law," under the provisions of the statute, is equivalent to a vote for the tax, and confers authority to levy the tax. There were other questions decided in that case, but they are not pertinent to the matters now before us.
It is a correct proposition that the property in one district may not be taxed, when it clearly appears that such tax is for the exclusive (415) benefit of another. Keith v. Lockhart, supra. The principle of uniformity in taxation forbids the imposition of a tax on one municipality or part of the State for the purpose of benefiting or raising money for another, 37 Cyc., 749, and Harper v. Comrs., 133 N.C. 106, furnishes an illustration of the same general principle when applied to a local assessment for building such fences. In that case it appeared clearly that Federal Point Township would derive no benefit whatever from the building of the fence, and was taxed under the act of 1903 solely for the benefit of the other part of the county of New Hanover, which was stock-law territory. The General Assembly, by this and previous legislation, not necessary to be more particularly described, has conferred upon those parts of Duplin County, composing its stock-law territory, certain rights and privileges which they desired to enjoy, and which are peculiarly local in character. It was deemed wise that the question as to whether the stock law should be adopted in the entire county should be submitted to a popular vote. This was, of course, in practical effect, submitting the question as to whether in the other part of the county not then under the operation of the stock law there should be stock law or a free and open range. This was a policy in which the whole county might be interested, at least the Legislature so thought, as it did not restrict the election to any one section, large or small, but extended it to all the county. If "no stock law" was adopted for that part of the county not already within stock-law bounds, it required that a county fence should be built and provided for the levy of a tax to pay for its construction and another tax upon the entire county to pay for its maintenance and repair, and for the levy of still another tax upon the stock-law territory to pay for the maintenance and repair of its own part of the fencing necessary to the enjoyment of its special privileges. This legislation should not be declared by us as unconstitutional and *Page 477 
invalid unless upon the clearest showing that it is so, as there is a strong presumption in favor of its validity, nor unless a conflict between it and the Constitution is manifest. Lowery v. School Trustees, 140 N.C. 33;Sutton v. Phillips, 116 N.C. 502; S. v. Baskerville, 141 N.C. 811. The court is exercising a very delicate function when it is sitting in judgment upon the validity of an act of legislation. It is one that should be exercised sparingly, and the legislation should be permitted to stand unless its constitutionality is clear beyond any reasonable doubt. We are not to question the wisdom or policy of the statute under consideration, but should enforce it as it is written, unless we conclude that there is an unmistakable conflict with the organic law. 8 Cyc., 776. We may assume a fact to exist which will sustain an act, but not one which may impeach its validity, and everything must clearly appear upon which the court can declare it to be void, for a presumption exists in favor of its validity, as we have shown. Lowery v. School Trustees,140 N.C. 33.
The Legislature, in the passage of the statute before us, has proceeded upon the idea that the parts of Duplin County which were, before its enactment, under the operation of stock law were not only specially benefited thereby, but that they would also receive an additional benefit from the building and maintenance of the county fence, as, on the face of the statute, the avowed purpose in building the fence is to protect the citizens of the county. We have nothing here to show that this is not true, but we can readily perceive how it may be correct.
It is said by defendants in their brief: "There is no discrimination in this case, for that the excepted districts have what they regard as the benefits of stock law, and all property in such districts is taxed alike to secure this benefit. There is no double tax, for that the county, as a whole, pays for fencing the county fence, as authorized by the vote of the people, while the excepted districts are made stock-law territory, which must be fenced by the people living therein and enjoying the benefits thereof."
The establishment of a separate taxing district for local purposes does not exempt its inhabitants from any charges for the general public good, as, for example, the creation of a school district in order to confer special educational facilities there which its residents would not enjoy under the public school system of the county in which the school district is situated. This does not relieve them from the burden of taxation for general school purposes.
Judson on Taxation (1903), sec. 355, thus states the general theory upon which this kind of taxation rests: "Special assessments for local improvements are made under the sovereign power of taxation, yet they are clearly distinguished from regular tax levies made under State *Page 478 
authority for general public purposes. Taxes proper, or general taxes, proceed upon the theory that the cost of government is a necessity; that it cannot continue without means to pay its expenses; that for those means it has the right to compel all citizens and property within its limits to contribute; and that for such contribution it renders no special benefit, but only secures to the citizen that general benefit which results from the protection of person and property and the promotion of those various schemes which have for their object the welfare of all. On the other hand, special assessments or special taxes are justified by the principle that when a local improvement enhances the value of neighboring property that property should pay the expense. Special assessments are made upon the assumption that a portion of the community will be specially and peculiarly benefited by the enhancement of the value of property peculiarly situated as regards the contemplated expenditure of public funds; and, in addition to the general levy, special contributions in consideration of the special benefit are required from the party (417) specially benefited," citing Ill. Cent. R. R. v. Decatur, 147 U.S. 190. And, again, in section 358: "Although special assessments are usually made for public improvements in municipalities, and form one of the most perplexing problems in municipal government, their use is not limited to municipalities. Public improvements, which may be of special benefit to property in a certain locality, may be required in any part of the State, and the application be thus warranted of the principle on which special assessments rest, that the property benefited by the improvement should pay the cost. The State, therefore, has the general power not only to determine that public improvements shall be made, whenever it deems them essential to the health and prosperity of the community, but also to determine to what extent the cost of such public improvements shall be paid by the public at large and what part shall be paid by the property specially benefited thereby."
We have freely conceded that the few ought not to be taxed for the sole benefit of the many, or the whole, nor should the latter be taxed for the sole benefit of the former. It follows that a single township, or specially formed district, in a county ought not to bear the whole county expenses, neither ought the whole county be taxed for the benefit of a single township or district. Any other rule might burden those who are not benefited at all, and benefit those who are exempt from the corresponding burden. As said in Kansas City v. Bacon, 157 Mo., 450: "There are two kinds of taxation, both emanating from the taxing power of the Government, but each resting on a different principle, the one aimed to raise a revenue for general governmental purpose. The one for its justification leaves out of view the question of individual benefit, *Page 479 
merging the individual in the community; the other, for its justification, advances the theory that the individual is benefited by the improvement contemplated, and because of this benefit he must contribute to the cost." But a tax imposed upon the stock-law districts under the act of 1915 to pay for the special benefit conferred upon the same districts as parts of the county, and another for the benefit accruing to the county or general public, do not violate those rules. The Legislature evidently thought that the stock-law districts received a double benefit, one arising from their special local privileges and advantages and the other from the building and maintenance of the county fence, which it enjoys in common with the other districts. We are not disposed to question the correctness of this view upon mere supposition of nonparticipation in both classes of benefits.
Our conclusion is that there was no error in the judgment of the court.
Affirmed.
Cited: Archer v. Joyner, 173 N.C. 77 (2c); Reade v. Durham, 173 N.C. 676
(2c); Comrs. v. State Treasurer, 174 N.C. 146 (3c); Comrs. v. StateTreasurer, 174 N.C. 152 (3j); Hood v. Sutton, 175 N.C. 100 (3c); Hill v.Lenoir Co., 176 N.C. 587 (3j); Parker v. Comrs., 178 N.C. 96 (3j); Riddlev. Cumberland, 180 N.C. 329 (2cc); Coble v. Comrs., 184 N.C. 355 (3j);Jones v. Board of Education, 185 N.C. 310 (3e); New Hanover County v.Whiteman, 190 N.C. 334 (c); Henderson v. Wilmington, 191 N.C. 284 (4c);Ellis v. Greene, 191 N.C. 765 (3c); Hinton v. State Treasurer, 193 N.C. 500
(4c); Fletcher v. Comrs. of Buncombe, 218 N.C. 13 (3c).
(418)